**GREEN EDGE ENTERPRISES, L.L.C., Appellant,**

v.

**INTERNATIONAL MULCH COMPANY, INC., Respondent.**

**No. ED 95510.**

Missouri Court of Appeals,
Eastern District,
Division One.

June 28, 2011.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 1, 2011.

Application for Transfer Denied Oct. 4, 2011.

Matthew J. Padberg, Anna E. Haber, The Padberg & Corrigan Law Firm, St. Louis, MO, for appellant.

David W. Harlan, Jennifer E. Hoekel, Bradley S. Eidson, Michael J. Hartley, Senniger Powers, LLP, St. Louis, MO, for respondent.

KENNETH M. ROMINES, J.

### Background and Procedural History

Green Edge Enterprises, L.L.C. (Green Edge) holds a U.S. Patent ("'514 Patent") for synthetic mulch, which consists of shredded rubber coated with a durable colorant. International Mulch Company, Inc. (IMC) manufactures and sells synthetic mulch and other products made from recycled rubber. On 28 April 2005, Green Edge and IMC entered into a licensing agreement (Agreement) which granted IMC various rights under the '514 patent. The Agreement provided that IMC would be required to pay Green Edge seven lump sump payments totaling $250,000, as well as royalties based on percentages of gross sales of materials sold by IMC. The Agreement also contains four other provisions relevant to this appeal.

(1) Paragraph 4.4 provides:

**Royalty Term.** Subject to the remaining provisions of this Paragraph 4.4, for so long as any of the independent claims of any issued patent constituting part of the PATENT RIGHTS which covers MATERIALS made, used or sold by IMC remains in force and has not been finally adjudged invalid or unenforceable by a court of law or government agency, EVIC's obligation under the AGREEMENT to pay Lump Sum Payments and Royalties to GREEN EDGE shall remain in effect as to MATERIALS sold in the geographic area where the patent claims remain in place. If all such independent claims of any such patent are finally adjudged to be invalid or unenforceable, for any reason, then thereafter IMC shall have the right to design, manufacture, have made, use, sell, offer to sell, distribute, import and/or export MATERIALS in any geographic area where invalidated and/or unenforceable claims were previously applicable, free from any obligation to make Lump Sum Payments or pay royalties to, or claim of infringement by, GREEN EDGE.

(2) Paragraph 7.2, in part, provides:

**Termination by IMC.** Subject to the provisions of Paragraph 4.1 and 4.4, IMC may not terminate this AGREEMENT, other than for cause as a result of an uncured default as provided below, if any amount of the Lump Sum Payments remains unpaid. If the Lump Sum Payments have been fully paid, IMC may terminate the AGREEMENT at any time and for any reason whatsoever or no reason, simply providing GREEN EDGE with thirty (30) days prior written notice. In such event and notwithstanding any provision hereof to the contrary, EVIC's only obligation to GREEN EDGE will be payment of any accrued royalties as provided for herein.

(3) Paragraph 7.3 provides:

**Survival of Terms and Obligations.** The respective obligations, representations and warranties of IMC and

GREEN EDGE under this AGREE-MENT, which are not, by the express terms of this AGREEMENT, to be performed fully while this AGREEMENT is in effect, shall survive termination of this AGREEMENT.

(4) Paragraph 7.4 provides:

**Effect of Termination.** Upon permitted termination of this AGREE-MENT, GREEN EDGE may re-license any patent constituting part of the PATENT RIGHTS at its sole discretion, and unless granted a new license, IMC may not make, use, sell, offer to sell, have manufactured, export and/or import and MATERIALS except if the any [sic] such patent has expired, and/or all claims of any such patent which cover MATERIALS have been adjudged invalid and/or unenforceable, in which case IMC may continue to design, make, have made, use, sell, distribute, offer to sell, export and/or import the MATERIALS. The preceding provision notwithstanding, IMC shall have the right to dispose of its existing inventory of MATERI-ALS for a period of ninety (90) days following the termination date of this AGREEMENT.

In mid-July 2008, IMC sent Green Edge notice it was terminating the Agreement pursuant to Paragraph 7.2. *See supra.* IMC continued to pay Green Edge all royalty payments due under the Agreement up to the period ending 16 August 2008. Since that time, IMC has continued to manufacture and sell synthetic mulch that Green Edge asserts is covered by the '514 Patent.

On 22 December 2008, Green Edge filed a two-count petition alleging that IMC breached the Agreement by (1) failing to pay the appropriate amount of royalties (Count I) and (2) ceasing to make royalty payments while continuing to manufacture products covered by the '514 Patent even though it has not been finally adjudged invalid or unenforceable (Count II). In Count II, Green Edge asserted that the federal district court's grant of summary judgment on 25 March 2008 invalidating the '514 Patent in a separate case was not a "final adjudication" within the context of Paragraph 4.4 of the Agreement which would have excused IMC's obligation to continue making royalty payments. Therefore, Green Edge argued that IMC's actions constituted a breach. IMC filed a motion for summary judgment on Count II of the petition on 26 April 2010. On 6 August 2010, the trial court granted IMC's motion for summary judgment on Count II of Green Edge's petition.[1]

IMC and Green Edge have also been engaged in relevant, collateral litigation. In 2005, Green Edge filed suit in the U.S. District Court for the Eastern District of Missouri against several defendants alleging infringement of the '514 Patent. IMC was originally a counterclaim defendant in this suit. On 25 March 2008, the federal magistrate granted summary judgment against Green Edge and invalidated the '514 patent. This judgment was later reversed by the Federal Circuit Court of Appeals on 7 September 2010. *Green Edge Enterprises, L.L.C. v. Rubber Mulch Etc., L.L.C., et al.,* 620 F.3d 1287 (Fed.Cir. 2010). In the most recent development, on 15 April 2011, a federal jury found that all eight claims of the '514 Patent were invalid because they were anticipated under 35 U.S.C. § 102, and obvious under 35 U.S.C. § 103.

### Standard of Review

This Court reviews a trial court's grant of summary judgment *de novo. ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.,* 854 S.W.2d 371, 376

---

1. Following this ruling, Green Edge dismissed Count I of its petition.

(Mo. banc 1993). The record should be reviewed in the light most favorable to the party against whom summary judgment was entered. *Id.* Summary judgment is appropriate only where there is no genuine issue of material fact such that one party is entitled to judgment as a matter of law. *Id.* at 380. Where a trial court grants summary judgment without articulating the reason it was granted, we will affirm if summary judgment was appropriate under any theory. *Tonkovich v. Crown Life Ins. Co.,* 165 S.W.3d 210, 215 (Mo.App. E.D. 2005).

### Discussion

■ Green Edge makes several claims that IMC either breached the Agreement or otherwise failed to live up to requirements delineated in it. The problem with such assertions is that they presume the Agreement between the parties ultimately controls their respective obligations. However, as the contract provides licensing for a Patent, federal law is inherently relevant. While we are inclined to agree with Green Edge that read as a whole the contract is ambiguous, we find the federal law issue dispositive. Specifically, a careful reading of *Lear v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), mandates our conclusion that IMC is relieved from its obligation to continue paying royalties to Green Edge while the validity of the patent is being challenged, regardless of contents of the Agreement.

In *Lear,* John Adkins, an inventor and mechanical engineer, was hired by Lear, Inc. in 1952 to develop improved gyroscopes for the aviation industry. *Id.* at 655, 89 S.Ct. 1902. Adkins succeeded, and in 1955 the parties entered into a licensing agreement which provided for the payment of royalties to Adkins so long as the patent was not invalidated. *Id.* at 657, 89 S.Ct. 1902. The contract provided that Lear could terminate the agreement if the patent was finally determined invalid. *Id.*

While Adkins was attempting to obtain a final determination from the Patent Office, Lear ceased paying royalties on a large number of gyroscopes based on Adkins' design, convinced Adkins would never acquire the patent. *Id.* at 659, 89 S.Ct. 1902. Adkins ultimately obtained a patent in 1960, and sued in California state court arguing breach of the 1955 contract. *Id.* at 660, 89 S.Ct. 1902. The California Supreme Court eventually determined that the 1955 contract controlled the issue, and that the doctrine of estoppel barred Lear from arguing the validity of the patent. *Id.* at 661, 89 S.Ct. 1902.

On appeal, the United States Supreme Court first abolished the application of the doctrine of estoppel in licensing cases, holding that a licensee was no longer barred from challenging the validity of patent merely by virtue of a licensing agreement with the licensor. *Id.* at 670–71, 89 S.Ct. 1902. The Court found that the public's interest in the free exchange of ideas necessitated the elimination of this doctrine because Licensees are often the only ones with enough economic incentive to challenge the patentability of an inventor's discovery. *Id.* at 670, 89 S.Ct. 1902. Without this challenge, unpatentable ideas might remain outside of the public domain. *Id.* The Court then divided the case into two issues: (1) whether Adkins should be entitled to obtain royalties for the period after the issuance of the 1960 patent, regardless of whether patent was later held invalid, and (2) whether Adkins had a claim to contractual royalties accruing before the 1960 Patent issued.

As to the claims for post-patent royalties, the Court rejected the notion that Lear should be required to pay royalties, regardless of the validity of the patent. *Id.* at 673–73, 89 S.Ct. 1902. The Court noted that even though the 1955 licensing agreement specifically provided that royal-

ties were to be paid until the patent was held invalid, "[t]he parties' contract ... is no more controlling on the issue than is the State's doctrine of estoppel, which is also rooted in contract principles. The decisive question is whether overriding federal policies would be significantly frustrated if licensees could be required to continue to pay royalties *during the time they are challenging patent validity in the courts* " *Id.* at 673, 89 S.Ct. 1902 (emphasis added). The court held that "Lear must be permitted to avoid the payment of all royalties accruing after Adkins' 1960 patent issued if Lear can prove patent invalidity." *Id.* at 674, 89 S.Ct. 1902.

For the more difficult issue of contractual royalties accruing before the 1960 patent issued, the Court left the decision up to the state courts whether to protect the owners of "*unpatented* inventions who are willing to disclose their ideas to manufacturers only upon payment of royalties." *Id.* at 674, 89 S.Ct. 1902 (emphasis added).

In the present dispute, Green Edge obtained the '514 Patent on 8 June 1999, and entered into the licensing agreement with IMC on 28 April 2005. IMC first challenged the validity of the '514 Patent after the issuance of the summary judgment in federal district court.[2] IMC does not dispute its obligation to pay royalties prior to its attempt to terminate the agreement, only its obligation to continue paying royalties after 16 August 2008, and after first challenging the '514 Patent's validity. This places the litigation squarely within the first scenario contemplated by the Court in *Lear.* Even the licensing agreement provisions in *Lear* are similar to those between Green Edge and IMC. Similarly, the contractual provision in Paragraph 4.4 cannot override the federal policies "favoring the full and free use of ideas in the public domain," and IMC is free to avoid the payment of all the royalties accruing while it is challenging patent validity in the courts. *Id.* at 674, 89 S.Ct. 1902.

■ Nevertheless, the obligation to continue paying royalties while challenging the validity of the patent is not determinative of whether the trial court acted properly in granting summary judgment. A material fact in this case which seriously affects the obligations of the parties under the licensing agreement and under state law is the validity of the '514 Patent. For example, should the patent ultimately be determined valid, IMC may be required to pay royalties under the provisions of the Agreement. On the other hand, if the patent is ultimately held invalid, IMC would owe Green Edge nothing more. At this time, however, neither this Court, nor the trial court, are capable of addressing these issues because the material fact of whether the patent is in fact valid under federal law has not been finally established. Therefore, the trial court erred is granting summary judgment.

This case is REVERSED and REMANDED back to the trial court for further proceedings consistent with this opinion.

ROY L. RICHTER, C.J. and
KENNETH F. THOMPSON, SP.J.,
concur.

**2.** The earliest point at which IMC could be deemed to have begun challenging the validity of the '514 Patent is when it moved for realignment with the other defendant's in federal suit. However, this realignment motion occurred after the order granting the motion for summary judgment on the invalidity of the '514 Patent on 25 March 2008. *See Green Edge Enterprises v. Rubber Mulch,* 620 F.3d 1287, 1295 n. 3 (Fed.Cir.2010).