Elliott E. BROWN, Plaintiff,

v.

OCEAN DRILLING AND EXPLORA-
TION COMPANY, Defendant.

Court of Chancery of Delaware,
New Castle.

Submitted March 14, 1977.

Decided June 9, 1977.

Robert W. Jacobs of Bader, Dorsey & Kreshtool, Wilmington, and Cummings & Lockwood, Stamford, Conn., for plaintiff.

James M. Tunnell, Jr., and Douglas E. Whitney of Morris, Nichols, Arsht & Tunnell, Wilmington, for defendant.

MARVEL, Chancellor:

Plaintiff seeks the granting of relief claimed to be due him under the terms of an agreement, which he allegedly entered into while employed by defendant and which is concerned with certain novel concepts allegedly designed by him for his employer, the defendant Ocean Drilling and Exploration Company,[1] in the form of an accounting for damages. The case is at present before the Court on defendant's motion for summary judgment of dismissal of the action as well as plaintiff's motion for partial summary judgment.

Defendant is engaged in the business of offshore drilling for petroleum and gas and over the years has designed and operated its own offshore drilling rigs. Its operations include development of mineral rights owned by others as well as drilling either for its own account or on the account of a syndicate of which either one of its subsidiaries or defendant itself is a party. Defendant also has interests in a number of

---

1. Hereinafter referred to as ODECO.

wholly and partly owned subsidiaries which engage in offshore drilling operations.

During the mid-1960's a decision was made to expand defendant's business operations so as to include offshore drilling in foreign waters. Drilling operations were thereafter commenced in the North Sea in which operations drilling rigs were employed of a design which had been adequate for defendant's domestic operations. However, such rigs proved to be not up to the severe weather conditions prevalent in the North Sea, which produced cracks and leaks in defendant's conventional drilling rigs. It was therefore determined by defendant in 1967 that a design would have to be made for an offshore oil rig which would be capable of withstanding the stresses of the North Sea.

Such project became a primary responsibility of plaintiff, who had commenced work for defendant in 1964 as an engineer and who had thereafter taken part in the design of earlier drilling rigs. In his capacity as chief engineer plaintiff thereafter designed a specialized rig known as the Ocean Prospector,[2] a semi-submersible device capable of self-propulsion.

The Ocean Prospector appears to have successfully coped with the difficulties encountered by earlier drilling rigs, its success being demonstrated in part by the fact that ten later rigs have been constructed on the basis of a design similar to that of the Ocean Prospector for use both in defendant's fleet as well as by others. However, none of such other rigs is owned by defendant itself, three rigs being owned by a wholly-owned subsidiary of defendant known as Canam. Four additional rigs, including the Ocean Prospector, are owned in part by defendant's subsidiaries and in part by other participants in joint ventures. Each of the remaining four rigs is owned by a corporation in which defendant has no interest. Defendant has received substantial sums of money in return for leave granted to others to use its rig design.

Patents have been issued covering the basic design of the Ocean Prospector rig as follows: by the United States of America on April 4, 1972; by Great Britain on May 2, 1973, and by France on January 17, 1975. Patent applications were also filed in Norway and Japan, but, after being initially rejected, have not been pursued by defendant. Applications in Germany and the Netherlands are presently pending but await defendant's decision as to whether or not to submit them to the proper authorities for formal processing. Next, the agreements concerning the construction of the eleven rigs in question were with one exception, all entered into prior to the issuance of the patents presently held by defendant.

The basic thrust of the litigation here involved is concerned with the terms of an agreement between defendant and plaintiff having to do with the latter's compensation for the design of the Ocean Prospector. Such agreement, which defendant claims is uniformly used in all contractual arrangements with its engineering and technical employees, is entitled "Agreement In Respect of Inventions and Patent Rights" and was entered into by the parties on September 27, 1967. Under the terms of such agreement plaintiff agreed (1) to assign to defendant all inventions which he might conceive or develop during his employment by defendant; (2) to disclose all inventions conceived by him to defendant and to no one else, and (3) to agree that all records and documents pertaining to such inventions were to be the sole property of defendant. In exchange, defendant agreed, in a document, which was basiclly drafted by attorneys for ODECO, that plaintiff was to receive " * * * ten percent (10%) of the gross proceeds of licensing fees received by ODECO in connection with the licensing of others under the Letters patent of any country issued upon an invention * * * " conceived by Brown. It was further agreed, however, that defendant would not be required to file patent applications on

2. ODECO argues that there is a doubt as to how much of the design work on the Ocean Prospector was actually performed by plaintiff

alone, but on the present record I conclude that the design in issue is plaintiff's.

any invention which might be developed during plaintiff's employment.

Plaintiff left defendant's employment on September 27, 1971, allegedly unaware of the arrangements made by the latter with others regarding the use of the Ocean Prospector design but later learned of the existence of such arrangements from other sources, including articles in trade journals. When questioned by plaintiff about the subject, defendant ultimately agreed to meet and discuss the question of whether or not plaintiff was entitled to an accounting with regard to the transactions of which he now complains and several meetings were thereafter held. However, the parties were unable to reach an accord, and this action was filed by plaintiff in June of 1974, charging defendant with breach of the agreement of September 27, 1967.

The basic contention made by plaintiff at this stage is that the revenues derived from the agreements to construct drilling rigs on the basis of the Ocean Prospector design were, in essence fees paid to defendant in connection with the licensing of others on the basis of letters patent issued upon plaintiff's invention which should be accounted for and that ODECO be made to remit to plaintiff 10% thereof as provided by the parties' agreement. The complaint also alleges that defendant has been unjustly enriched by reason of its failure properly to compensate plaintiff for his fair share of the profits gained by defendant from plaintiff's invention.

ODECO argues a number of points in support of its motion for summary judgment which is based in part upon the contention that with one exception the agreements in question were executed prior to the time when a patent was actually granted on the idea. Defendant also contends that the agreements in issue merely licensed the use of design drawings and did not make reference to a patent held by defendant. Next, it is argued that the term "under" in the phrase "under a patent", which was used in the inventions agreement, is not applicable to something which does not exist. In addition, defendant stresses the fact that the moneys which are the subject matter of this dispute were received or became contractually payable before a patent issued on the oil rig design in issue and were in no way contingent on or conditioned upon the issuance of any patent. Defendant concludes, therefore, that not having licensed a patent right it has no present obligation to pay plaintiff anything.

Plaintiff argues, in reply, that the license agreements were to all intents and purposes actually patent licenses and that defendant may not seek to avoid or reduce its contractual obligation merely because it was paid fees for the use of the rig design prior to the time of the issuance of plaintiff's patent. It thus appears that the legal effect of the agreements between defendant and such third party licensees have their impact on the outcome of the present cross motions.[3]

ODECO argues that inasmuch as such agreements were entered into prior to the grant of a patent, and because they admittedly did not mention the transfer of patent rights or use the term patent license that they may not be considered in connection with the present motions.

I am of the opinion that the validity of a patent licensing agreement is not dependent on the prior issuance of letters patent, *B. F Gladding & Co. v. Scientific Anglers*, 245 F.2d 722, reh. den. 248 F.2d 483 (6th Cir. 1957). See also, *Fur Grooving*

3. The agreements between defendant and the entities which were to build and use the rigs of the design in question are too numerous and lengthy to set forth in full. However, each agreement conferred upon a party other than defendant the right to build one or more rigs. In addition, although the right to use these rigs was not expressly conferred, it is clear that use was within the intentions of the parties since the agreements are replete with references to operation, performance and use of the rigs. Some of the agreements also provided for a primary area of operations although it was expressly stated that these areas were not to be considered exclusive. The agreements also contained terms precluding the transfer of the design or drawings and plans. Defendant further agreed in some cases to lend all assistance reasonably available in the event of a patent suit.

*& Shearing Co. v. Turano*, 39 F.Supp. 877 (S.D.N.Y.1941). Thus, a license may be granted before the issuance of a patent, *Davis v. Kittle Mfg. Co.*, 134 Cal.App. 254, 25 P.2d 253, 256 (1932), and, if granted without restrictions, when acted upon by the application of the lesson of the invention to mechanisms constructed before the granting of the patent, the licensing of its use afterwards will be protected, *Burton v. Burton Stock Car Co.*, 171 Mass. 437, 50 N.E. 1029 (1898); 69 C.J.S. Patents § 245, p. 767 (1951). Accordingly, the mere fact that license agreements were entered into prior to the granting of the patent in the present case is therefore not controlling.

■ Next, it is established that a formal granting of a license is not necessary in order to give it force and effect. Any language used by the owner of a patent or any conduct on his part disclosed to another, leading such other party reasonably to infer that the owner of the patent consents to his use of such patent in making, using or selling it constitutes a license, *DeForest Radio Tel. & Tel. Co. v. U. S.*, 273 U.S. 236, 241, 47 S.Ct. 366, 367, 71 L.Ed. 625 (1927). Thus, the mere failure of an agreement to include the word patent does not mean that such an agreement is not a patent license.

■ The term patent license is generally defined as the granting of permission to make, use and/or sell articles embodying an invention, or a transfer which does not affect the monopoly of a patent otherwise than by estopping the licensor from exercising prohibitory powers in derogation of the privileges conferred upon the licensee, *DeForest Radio Tel. & Tel. Co. v. Radio Corp.*, 9 F.2d 150 (D.Del.1925) aff'd 20 F.2d 598 (3 Cir. 1927). Compare *Henry J. Kaiser Co. v. McLouth Steel Corp.*, 175 F.Supp. 743 (E.D. Mich.1959), aff'd, 277 F.2d 458 (6th Cir. 1960).

■ By means of the agreements here in issue defendant transferred to various parties the right to make and use a drilling rig or rigs embodying the design in question here. No authority is cited in support of the conclusion that defendant now possesses the power unilaterally to withhold such rights simply because it now possesses the rights to subsequently issued patents on the self-propelled rig design here in litigation. Indeed, to find that defendant could successfully prevent further construction and use on the basis of such design would directly contradict the very terms of such agreements. I therefore conclude that unless defendant's defenses have merit, such agreements constitute effective patent licenses within the meaning of that term as defined in *DeForest Radio Tel. & Tel. Co. v. Radio Corp.*, supra, and that plaintiff appears to be entitled to an accounting for ten percent of the gross proceeds received by defendant in exchange for the rights thereby granted.

Next, defendant's argument that the issuance of patent licenses prior to the grant of a patent is not included within the terms of the inventions agreement because the term "under" is allegedly not applicable to something non-existent is not persuasive. Moreover, a fair reading of the agreement calls for a conclusion that a license is "under" a patent within the meaning of the inventions agreement in situations in which the licensee is protected from patent infringement actions arising out of his use of such patent. No intention to exclude the class of those acting under licenses issued prior to the grant of a patent is manifest from the use of the term "under." Moreover, the construction urged by defendant would tend to defeat one of the express purposes of the parties' basic agreement which was to provide plaintiff with additional compensation in return for the assignment by him of his inventions or discoveries to defendant.

■ A similar result follows from defendant's argument that plaintiff should not share in proceeds which were received or contractually fixed before a patent issued. The significant fact is that the license agreements conveyed an unqualified permission to make and use the rigs of plaintiff's design without limitation as to time and in most cases without limitation as

to place of construction, in a manner sufficient to estop defendant from asserting its prohibitory powers once a patent had issued. This, in my opinion, is sufficient to cause the agreements to constitute patent licenses, *DeForest Radio Tel. & Tel. Co. v. Radio Corp.,* 9 F.2d 150 (D.Del.1925).

■ Defendant also argues that the fees which it has received from its own subsidiaries for a license for the construction of rigs to be used in its business did not arise "* * * in connection with the licensing of others * * *", the basic contention appearing to be that the term "others" does not include business entities in which defendant holds a partial or controlling interest. Defendant finds support for this contention in the so-called shop right theory under which an employer is entitled to a non-exclusive royalty free license and in some cases equitable ownership of an invention conceived and developed by an employee during his employment. See *Melin v. United States,* 478 F.2d 1210, 201 Ct.Cl. 748 (1973), and generally 9 Williston on Contracts, Sec. 1016 et seq. (3d ed. 1967). While this rule has application to a situation in which there is no agreement concerning ownership of an invention to be developed, in this case the parties established their respective rights in advance by contract. In other words, plaintiff agreed in advance that defendant would become the owner of any inventions to be developed by plaintiff and executed assignments to this effect, the issue at this point being whether or not fees received from subsidiaries by defendant were paid over in connection with the licensing of "others". Thus, defendant was free at all times to select the manner in which it would conduct its business operations and chose to license rights to build and use the rigs in question to businesses recognized in law as separate legal entities. As a result it found it necessary in each such case to require the payment of sub-

stantial consideration in exchange for the granting of such rights. Accordingly, this Court may not now hold that such licensing fees were not received from "others" than defendant. The unambiguous meaning of the inventions agreement is that the term "others" means all others. As a result plaintiff is entitled to receive his fair share of all licensing fees received by defendant.

Defendant also contends that except for certain rigs constructed in the United States there has not been nor will there be, activity under the licenses at issue within the territorial scope of the patent here involved. Plaintiff takes the position on the other hand that the licenses here in issue permit world wide use under whatever patent protection might be obtained in any specific area and that his rights are not affected by the territorial extent of the patent protection which was in fact obtained.

■ The rights and interests of the parties to a license agreement are to be ascertained from its terms including, of course, the limitations and restrictions which it contains, 69 C.J.S. Patents Sec. 250 (1951) and 4 Deller's Walker on Patents Sec. 408 (1965). In the case at bar the license agreements impose no restrictions upon the permissible areas for use or manufacture of the rigs in issue.[4] A patent license which imposes no place limitation is coextensive with the entire country, *Kidd v. Johnson,* 100 U.S. 617, 25 L.Ed. 769 (188), and 4 Deller's Walker on Patents Sec. 384 (1965); 60 Am.Jur.2d Patents Sec. 356 (1972). Since a patent was granted on the rig design in question in the United States on April 4, 1972, it is concluded that the various licenses under the agreements presently possess the right to use the rigs of this design throughout the waters over which the jurisdiction of United States extends without risk of infringement. Similarly, where manufacturing of more than one rig

---

**4.** Two joint venture licenses provided for primary areas of operation, but also expressly provided that such areas were not to be considered exclusive. The agreements also referred to inevitable conflicts of interest, as defendant points out, but the reference is directed towards employment opportunities for the drilling barges and not to disputes over patent rights. In addition, only one of the agreements in question, namely one between ODECO and Grenadine Exploration Co., Ltd., specified a place of manufacture.

is authorized, such conduct would seem permissible within the jurisdiction of the United States. As such, the actual location of these rigs at various times outside of the jurisdiction of the United States is not controlling since there is no requirement that a patented article actually be present in a particular jurisdiction in order for a licensee to have a valid license in such geographical area. A license does not cease to exist merely because the patented article is not within a specified jurisdiction. If a licensed rig were to be transported at some future time to an area within the reach of the United States patent law, it would be protected against claims of infringement. I conclude that the emphasis placed by defendant on the physical location of the rigs in issue is misplaced.[5]

Defendant has also pleaded a number of affirmative defenses in opposition to plaintiff's cross motion for summary judgment, arguing to begin with that there is a factual issue as to whether or not the patents here in issue are valid.

■ In support of such contention defendant relies upon the case of *Lear, Inc. v. Adkins*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), which rejects the doctrine of licensee estoppel under which a licensee may be estopped from denying the validity of his licensor's patent. The present case is, however, clearly distinguishable from *Lear, Inc. v. Adkins*, supra, in that here none of the licensees involved seeks to repudiate his obligation to pay for the rights he has received. Rather, defend-

ant as licensor seeks to deny plaintiff as inventor a share of the proceeds which defendant has already received from licensees in exchange for the rights granted them to make and use drilling rigs based on plaintiff's design.

Furthermore, were a licensee to obtain a judgment at some time in the future holding the patent owned by defendant to be invalid, the license agreement in issue would not necessarily be void ab initio, nor would defendant be required to return the licensing fees which it has already received. See *Troxel Mfg. Co. v. Schwinn Bicycle Co.*, 465 F.2d 1253 (6th Cir. 1972), cert. denied, 416 U.S. 939, 94 S.Ct. 1942, 40 L.Ed.2d 290 (1974), which holds that neither equity nor public policy requires a licensor to return royalties paid by a licensee after a determination that an underlying patent is invalid.

■ Defendant also argues that a fact question exists as to whether plaintiff was actually the inventor of the rig design in issue. However, it is clear that defendant has accepted the benefits of the inventions agreement and its own prior recognition that plaintiff was the inventor now prevents it from attacking plaintiff's status as inventor in this proceeding.

■ In support of its argument to this effect, defendant points to certain evidence of record which suggests that the plan to make the rig self-propelled was conceived by its own management rather than by plaintiff.[6] However, there is no evidence that anyone in defendant's management did

---

**5.** A lengthy appendix is filed with the Court which contains detailed excerpts from the patent laws of various countries. In addition, both parties have made detailed arguments as to the scope and actual protection afforded by both United States and foreign patent laws on the high seas. However, because of the view taken of the case, it is unnecessary to consider these issues. Nor is it necessary to determine whether the license agreements constituted patent licenses under the laws of the United Kingdom or France, which have also granted patents for the Brown invention.

**6.** Brown was questioned during his deposition about the concept of self-propulsion. The following discussion took place:

"Q O.K. Who had the idea to make it?
A I had the idea to make it self-propelled.
Q That was your idea?
A Well, yes.
Q No one else suggested that to you?
A There had been some discussions concerning self-propelling, semi-submersibles prior to this.
Q And who participated in those discussions?
A I can't—I really can't recall.
Q Were there any . . .
A But I wanted this rig to be self-propelled, and one of the layout considerations for the hull was this layout. O.K.? Now, later on someone in ODECO's management said, 'Fine, go ahead.' "

more than to approve the general concept of rig self-propulsion and an employer cannot be regarded as the inventor when he merely suggests or approves of a certain result without communicating any suggestions as to the means by which it could be obtained, 69 C.J.S. Patents Sec. 92 (1951), and 60 Am.Jur.2d, Patents Sec. 142 (1972).

Since there is no evidence in the present record that the contribution of ODECO's management went beyond a general accord with the desirability of the concept of self-propulsion, no genuine question of fact exists as to plaintiff's status as inventor or on the question as to whether or not the patent application should have been filed jointly on behalf of plaintiff and ODECO.

 Finally, plaintiff's other theories of recovery namely that of unjust enrichment and that based on foreign patent statutes are rejected, the former because it is based on quasi contract and here an express contract is relied on, and the latter because there is no basis for foreign patent statutes being made applicable to a contract between nationals residing in the United States.

Plaintiff's motion for partial summary judgment for an accounting is granted and defendant's motion for summary judgment of dismissal is denied.

*On notice an appropriate form of order may be submitted.*