**NATIONAL SEMICONDUCTOR CORP., Plaintiff,**

v.

**LINEAR TECHNOLOGY CORP., Defendant.**

No. C 85–20374 SW.

United States District Court, N.D. California.

June 13, 1988.

Karl A. Limbach, J. William Wigert, Jr., Ronald L. Yin, Gerald T. Sekimura, Philip A. Girard, Stephen M. Everett, Limbach, Limbach & Sutton, San Francisco, Cal., Jack E. Brown, Michael J. Malley, Alan H. Blankenheimer, Joseph W. Mott, Charles A. Blanchard, Brown & Bain, P.A., Phoenix, Ariz., for plaintiff Nat. Semiconductor Corp.

Michael A. Ladra, Peter J. Courture, Wilson, Sonsini, Goodrich & Rosati, P.C., Palo Alto, Cal., Robert C. Morgan, Laurence S. Rogers, Ron E. Shulman, Mark D. Rowland, Fish & Neave, New York City, for defendant and counterclaim-plaintiff Linear Technology Corp.

ORDER (1) DENYING DEFENDANT'S MOTION AND GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON INVALIDITY AND UNENFORCEABILITY AND (2) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT TO DISMISS DEFENDANT'S FIRST COUNTERCLAIM

SPENCER WILLIAMS, District Judge.

## BACKGROUND

Plaintiff-counterdefendant National Semiconductor Corporation (hereinafter "NSC") is a Delaware corporation which develops, manufactures and sells semiconductor devices. So does defendant-counterclaimant Linear Technology Corporation, a California corporation established by four former NSC employees 1981. NSC brought this suit against Linear Technology in June of 1985 for alleged infringement of eleven patents relating to "monolithic integrated circuits" (hereinafter "ICs"). ICs are a collection of electronic elements which are interconnected to form an electronic circuit. These elements and interconnections are formed in or upon a substrate of semiconductor material.

NSC alleges patent infringement under 35 U.S.C. §§ 271, 281 and seeks permanent injunctive relief, treble damages and attorneys' fees. Linear Technology raises several defenses, including non-infringement, failure to comply with the Patent Act, estoppel, misuse, and fraud or inequitable conduct in acquiring some of the patents. Linear Technology also counterclaims for non-infringement, invalidity and unenforceability in its first counterclaim, violations of the Sherman Antitrust Act, 15 U.S.C. § 2, in its second cause of action, and unfair competition in a third counterclaim. These last two counterclaims arise from allegations that NSC's lawsuits (here and in two state courts) are "shams and baseless." Both parties demand a jury trial.

## DISCUSSION

I. Invalidity And Unenforceability

Defendant Linear Technology argues that National Semiconductor's alleged in-

ventions claimed in patents 3,974,456 (hereinafter the "'456 patent"), 3,959,733 (hereinafter the "'733 patent"), and 4,228,404 (hereinafter the "'404 patent") are invalid because they were described in printed publications in the United States more than one year prior to the dates of the patent applications. Plaintiff National Semiconductor responds in its summary judgment motion that these papers were neither accessible by nor disseminated to persons interested in the subject matter of the patents. Therefore, the papers are not "publications" within the meaning of 35 U.S.C. § 102(b). Accordingly, they argue, the patent is valid and enforceable.

The court finds defendant's objections without merit. For the reasons discussed below, the court rules in favor of the plaintiff.

## A. *Facts*

The Institute for Electrical and Electronics Engineers (hereinafter the "IEEE") is a professional organization of several hundred thousand engineers in the electronic industry. Each February, the group sponsors the International Solid State Circuits Conference, or "ISSCC." This is a leading forum for oral presentation of written articles describing research and development. The summer before the conference, the ISSCC makes a "call for papers." Members must submit a 35 page abstract and a 300–500 page summary of their articles to the ISSCC Program Committee for consideration. No previously published papers are allowed, and the call for papers states that the summaries will not be published. The Committee meets in October and decides which articles may be presented in February. The decision is actually made by a subcommittee in each field. About nine or ten experts sit on a subcommittee. After selection in October, the authors revise their papers for publication.

The IEEE publishes the papers in a digest at the February conference. The association obtains copyright protection for the annual digests. These copyright registrations state that they are the first dates of publication.

Ronald Russell was one of the inventors of NSC's '456 and '733 patents. He and Daniel Culmer co-authored an article entitled "Ion Implanted JFET–Bipolar Monolithic Analog Circuits" (hereinafter the "Russell article"). The paper allegedly describes the features of the inventions in the '456 and '733 patents. In October 1973, the Linear Subcommittee selected his paper. Russell presented his paper at the February 1974 ISSCC.

Robert Widlar wrote an article entitled "Low–Voltage Techniques" (hereinafter the "Widlar article"). That paper allegedly describes the elements of the claims in the '404 patent. The October 1977 Linear Subcommittee selected Widlar's paper. Widlar presented his work at the February 1978 ISSCC.

The Linear Subcommittees these two years consisted of approximately nine experts from numerous competing companies. James Solomon from NSC sat on both subcommittees. In October 1973, he distributed copies of the Russell paper to the other subcommittee members.[1] And in October 1977, he distributed the Widlar paper for the members' review.

## B. *Publication of the Papers*

■ Under 35 U.S.C. § 102(b), a patent is invalid

if the invention was ... described in a printed publication in this or a foreign country ... more than one year prior to the date of the application for patent in the United States.

Whether a document is a "printed publication" is a question of law. *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1568 (Fed.Cir.1987). The test is whether

it has been disseminated or otherwise made available to the extent that persons interested and of ordinary skill in the

---

**1.** It is uncertain exactly how many copies Solomon distributed at the two ISSCCs. NSC contends he submitted 15 to 20 copies. Linear Technology, however, asserts he hand carried the copies to the meeting and distributed only one per member. This would account for nine or ten copies. As the court's holding makes clear, this distinction is not material.

subject matter or art, exercising reasonable diligence can locate it and recognize and comprehend therefrom the essentials of the claimed inventions....

*Massachusetts Institute of Technology v. AB Fortia,* 774 F.2d 1104, 1109 (Fed.Cir. 1985). A party attacking patent validity has the burden of proving invalidity by clear and convincing evidence. *Carella v. Starlight Archery and Pro Line Co.,* 804 F.2d 135, 138 (Fed.Cir.1986).

Linear Technology argues that the submission of the Russell and Widlar papers in the October preceeding the conference constitutes a publication of the works. The IEEE's copyright registration for the Russell paper lists February 13, 1974 as the date of first publication. Similarly, the registration lists February 15, 1978 as the first publication for the Widlar paper. If the October date is used to determine publication, the papers would have been published over one year prior to the patent application, and the patents would be invalid and unenforceable. However, a February date of publication would be within the one year limitation.

Linear Technology contends that the papers were up for grabs once selected in October by the subcommittee. They describe a process where the papers would arrive at the meeting, the members would scurry to get a copy,[2] then the members would hurry back to their places of employment to evaluate them and often show them to co-workers to get their opinions on the contents. Several subcommittee members state that the papers were submitted with no restrictions on them. Thus Linear argues, competitors could wind up with articles written by employees of their competitors. Linear Technology suggests that this possibility constitutes publication. Several subcommittee members have stated in their depositions that they took the Widlar article back to their companies and distributed it around.

However, the court finds that this grabbing of papers and showing them to competing companies was not the practice nor the intent of the ISSCC articles. Four of the five individuals who Linear Technology points to as stating they showed either the Russell or Widlar papers to their company co-workers were NSC employees at the time. This court is not aware of any ruling which holds that distribution within an originating company constitutes publication.

As to the fifth subcommittee member, Grebene, who stated he took the Widlar paper back to his company to show to a co-worker, the court holds that this behavior does not constitute publication and may have been in contradiction with IEEE policy. Linear Technology has not brought forth any subcommittee member who admits to disseminating Russell's paper beyond the subcommittee. Six of the nine Linear Subcommittee members who read the Widlar paper gave declarations. Of these six, only Grebene admitted to showing the paper to non-members. Indeed, one Linear Subcommittee member stated he knew it was improper to disclose a paper to a company colleague if he worked for a company competing with the one that originated the work. Two members stated that they were aware of the fact that a member might occasionally disclose a paper to a colleague to help the member better evaluate the material. The court believes that this occasional assistance is not in keeping with IEEE policy, nor does it invalidate the policy.

The court holds that the papers were not generally available to a significant portion of the interested public of engineers. The IEEE intended to hold all conference articles as privileged documents until it published the digests. This is indicated by the fact that the ISSCC made a call for papers that were to be an abbreviated and less complete draft than the article presented at the conference. Subcommittee members were only to review and select from these papers. Furthermore, the IEEE's policy of copyrighting the works establishes that its members believed that the papers would not be considered published until the February articles appeared.

**2.** Apparently, there was sometimes a shortage of copies.

In addition, NSC points to a December 1983 written policy that "referees treat the contents of papers under review as privileged information not to be disclosed to others before publication." It adds that "no one with access to a paper under review will make any inappropriate use of the special knowledge." This was not written policy until December 1983. However, according to Patricia Penick, Manager of Publishing Administration, prior to that time this policy was implicit. This is verified in the 1983 written policy itself. The IEEE stated that the reason it put the policy into writing is that

> although implicit to the peer review system, this policy is explicitly stated in response to the nondisclosure requirements of a Patent Law affecting many European countries.

(*IEEE Publications Board Policies Pertaining to the Review of Papers*). Although not determinative in itself, the court finds the fact that the ISSCC had a written policy of privilege which refers back to a long-standing policy additionally persuasive.

NSC has established that all but one of the Linear Subcommittee members state that they either would not or did not let anyone else view the Russell and Widlar papers. This court finds the case of *In re Bayer*, 568 F.2d 1357 (CCPA 1978), parallel to the situation here. There, the court found that a master's thesis which was known to three members of a student graduate committee was not a "printed publication" when the document had merely been placed in a publicly accessible area of the library where it remained unshelved and uncatalogued as of the critical date in question. In fact, in *Bayer* there was no indication of an implicit committee policy of privilege or confidentiality. The access simply did not exist, even though it was possible to obtain the student's thesis if one knew enough to ask a committee member. Furthermore, the court impliedly held that this exclusive three member committee was insufficient to constitute "the public" as contemplated under patent law. *See Id.* at 1361.

Defendants Linear Technology point to *Maurice A. Garbell v. Boeing Co.*, 385 F.Supp. 1, 41 (C.D.Cal.1973), *aff'd*, 546 F.2d 297 (9th Cir.1976), as a similar case. Dr. Garbell wrote a paper which described and disclosed the subject matter of his later issued patent, the design and shape of aircraft wings. He distributed the paper without any restrictions at the Institute of Aeronautical Sciences with the intent that the IAS review for possible presentation. The court held that "by virtue of the disclosure to the IAS and its Editorial Board," Garbell's paper was a printed publication under § 102.

However, the holding in *Garbell* is unpersuasive as to this case. The IAS had allowed the paper to be distributed to a great many people in the field. The *Garbell* court clearly noted that a "great number of people in [Garbell's] airframe industry" had access to his paper when the court went on to make its holding of prior publication. *Id.* at 41. There has been no such showing of dissemination here.

### C. Conclusion

The Russell and Widlar papers were not intended to be available to anyone outside the Linear Subcommittee membership until the February conferences, and in general they were not in fact disseminated to others. This membership of nine or ten engineers from competing companies does not constitute the public or interested persons in the electronics field as contemplated by 35 U.S.C. § 102(b). In contrast, the articles were made available to over 1700 engineers at the February 1974 ISSCC and 2100 engineers at the February 1978 conference. Thus, the court holds that the dates of the February conferences are the dates of first publication as to the Russell and Widlar articles. Accordingly, the court denies defendant Linear Technology's motion for summary judgment and grants plaintiff NSC's cross-motion for summary judgment as to this issue of validity.

### II. Counterclaim on the '059 Patent

NSC also asks this court to dismiss Linear Technology's first counterclaim insofar

as it seeks declaratory judgment of non-infringement, invalidity and unenforceability of U.S. Patent 3,579,059 (hereinafter the "'059 patent"). The relevant portion of Linear Technology's first counterclaim actually requests a declaratory judgment that the '059 patent was invalid and procured by fraud or inequitable conduct. NSC contends that these claims are rendered moot by the dedication to the public of the patent. Plaintiff argues that Linear Technology could still maintain its second and third counterclaims for antitrust and unfair competition regarding the '059 patent without a ruling as to the validity of the '059 patent.

As expressed below, this court finds that Linear Technology may maintain its request for declaratory judgment.

A.  *Dedication of the '059 Patent*

During the course of litigation and negotiation, Linear Technology pointed to several articles and advertisements published in 1967 which Linear complained invalidated the '059 patent. NSC dedicated the patent to the public on December 11, 1985 in accordance with 35 U.S.C. § 253. On February 25, 1986, Judge Robert P. Aguilar allowed NSC to amend its complaint to remove its charge of infringement of the '059 patent. His order provided that all questions of patent validity were to be tried together. He did not exclude those concerning the '059 patent.

On November 19, 1985, Judge Aguilar ordered the case bifurcated for trial, ruling that the patent liability issues would be tried first followed by Linear Technology's antitrust, patent misuse and unfair competition counterclaims. On February 24, 1988, this court ordered further bifurcation of the patent trial: the damages issues will immediately follow a liability determination.

35 U.S.C. § 253 provides that "any patentee may disclose or dedicate to the public the entire term, or any terminal part of the term, of the patent...." The Court in *Lear, Inc. v. Adkins*, 395 U.S. 653, 668, 89

S.Ct. 1902, 1910, 23 L.Ed.2d 610 (1969), noted that federal law requires that all ideas in general circulation be dedicated to the common good unless protected by a valid patent.

■ Courts have ruled that dedication of a patent typically renders moot the issues of validity, infringement and enforceability. When a patentee dedicates the patent to the public, there is no longer a justiciable case or controversy before the court with respect to validity. Thus the court has no subject matter jurisdiction. Nor can the patentee enforce the claims or attempt to reissue any of them. *See Chris–Craft Industries, Inc. v. Monsanto Co.*, 59 F.R.D. 282 (C.D.Cal.1973); *Jack Winter Inc. v. Koratron Co.*, 327 F.Supp. 206 (N.D.Cal. 1971); *Laitram Corp. v. Deepsouth Packing Co.*, 279 F.Supp. 883 (E.D.La.1968).

Noninfringement of the '059 patent is no longer relevant to Linear Technology's counterclaims. As to that issue, the dedication of the patent leaves no remaining justiciable case or controversy. Insofar as the counterclaim implies this issue with respect to the '059 patent, the issue should be dismissed from the defendant's counterclaim.

■ However, invalidity, inequitable procurement, and bad faith enforcement of invalid patents are predicates to Linear Technology's antitrust and unfair competition counterclaims as they apply to the '059 patent. Linear Technology will need a ruling that the '059 patent was invalid prior to its dedication to the public in order to establish that NSC had the requisite intent to foster antitrust violations and patent misuse. When NSC dedicated its patent to the public, it did not stipulate that its patent was invalid from the time its application was granted.[3] Thus, if this court does not permit Linear Technology the opportunity to seek a ruling of invalidity, it may effectively disarm the defendant's ability to establish one of the elements of its other counterclaims. The court will allow Linear

---

**3.** Dedication to the public is clearly distinct from a disclaimer based on a determination that the claims are too broad or invalid, such as was

the case in *Standard Packaging Corp. v. Curwood, Inc.*, 365 F.Supp. 134, 182 USPQ 399 (N.D. Ill.1973).

Technology to continue to pursue a judgment which declares the '059 patent invalid.

The court does not find authority that directly addresses the issue of dedication to the public as it applies to this case. Indeed, very little authority exists on the general subject at all. However, the court finds the concerns expressed in *Standard Packaging Corp. v. Curwood, Inc.*, 365 F.Supp. 134, 182 USPQ 399 (N.D.Ill.1974), mirror those which concern the court in this case. In *Standard Packaging*, the patentee filed suit based on infringement, but after over a year of pretrial activity determined that its patented claims were "too broad or invalid." The patentee filed disclaimers of all rights with the U.S. Patent Office, and it moved to dismiss. However, the defendant had already filed a counterclaim seeking a judgment declaring invalidity and noninfringement. The defendant asked the court to grant it summary judgment as to the counterclaim. The court denied the motion, in part, as it applied to infringement, holding that this issue was mooted by the fact that the disclaimer declared the patent to be invalid. However, the court granted the motion as it applied to validity. The patentee opposed this ruling on the basis that this issue was also moot. The court stated:

> This lawsuit, like any other, was commenced with the understanding that the defendant could raise and contest any colorable issue or defense. Defendant's counterclaim and subsequent summary judgment motion are valid and proper litigation devices, the effect of which cannot be avoided by Plaintiff's non-judicial disclaimers or declarations. To hold otherwise would permit this Plaintiff to determine the scope and content of its

opponent's substantive rights. Accordingly, Curwood is entitled to summary judgment on this issue.

*Id.*

This court notes that Linear Technology's needs are more compelling that the defendant in *Standard Packaging* because that defendant did not have additional counterclaims comparable to Linear Technology's antitrust and unfair competition issues presented here. Linear Technology cannot be expected to give up the predicate of invalidity when it is so crucial to its own claims.

The court does not reach this holding without some difficulty. NSC strongly argues against such a ruling, and indeed suggests that the general rulings mentioned above in such cases as *Jack Winter* and *Laitram* cannot permit it. Indeed, these cases at first blush indicate that the court should not take subject matter jurisdiction over the validity issue. Under close scrutiny, however, the persuasiveness of these cases is greatly reduced when viewed in light of the facts before this court.

One of the defendants in *Jack Winter* had brought a motion for summary judgment seeking an order dismissing all claims by the patentee that it interfered with the patentee's contractual relationships in connection with a dedicated patent.[4] The court held that dedication of the patent rendered futile a decision of invalidity or noninfringement on the merits. *Jack Winter*, 327 F.Supp. at 211.[5]

The language used by the court in *Laitram* illustrates the distinction between that case and the one before this court. The *Laitram* court held that dedication of a patent makes moot the question of

---

**4.** *Jack Winter* consisted of several cases originating in various districts across the country and consolidated in the Northern District of California. The patentee, Koratron, had charged this particular defendant, Deering Milliken, with inducing the patentee's licensees to breach their contracts by advising them that the defendant's product was outside the scope of the patent. Koratron filed its law suit in the Northern District of California. In turn, Deering Milliken filed a claim in the Southern District of New York seeking declaratory judgment that the patent was invalid and there was no infringement.

*Jack Winter*, 327 F.Supp. at 207 and 211. Thus, even though the defendant Deering Milliken's claims are not actually counterclaims, they may be analogized as such for the purposes of this case.

**5.** The court noted that the patent could not be used to evaluate any claims which arose "from the time that any claims were asserted based upon this patent." *Jack Winter*, 327 F.Supp. at 211.

whether the patent was invalid *ab initio.* That court said:

> Laitram's dedication to the public of [its] patent ... terminates all of its rights in that patent, *just as if it had expired. It would therefore serve no purpose for this Court to pass upon the validity or invalidity of that patent.... [Defendant] has been unable to show any reason why the court's determination of the asserted invalidity of the patent before its dedication would be of any legal significance.*

*Laitram,* 279 F.Supp. at 891 (emphasis added).

In antithesis, this court finds the fact that invalidity is an element of Linear Technology's other counterclaims to be of compelling significance. Dedication does not moot the validity issue in this instance.

Neither *Jack Winter* nor *Laitram* involved active counterclaims by the defendant that turned on a showing of invalidity as do unfair competition or antitrust. The reply brief offered by NSC suggests that they do, in particular because the background information provided in *Jack Winter* makes a cursory reference to "antitrust and patent misuse actions." *Jack Winter,* 327 F.Supp. at 207. Nevertheless, the most careful reading of *Jack Winter* cannot discern the nature of the antitrust counterclaims that are mentioned, nor can it even be determined which of the numerous defendants brought those counterclaims. Thus the court cannot assume that it was this defendant or that these counterclaims were predicated on validity of this patent. In addition, it is clear that the court in *Laitram* denied the defendant's motion to amend its complaint to add an antitrust claim because the statute of limitations had run on the claim. *Laitram,* 279 F.Supp. at 891.[6]

The defendant should present a motion for summary judgment to this court as to its counterclaim for declaratory judgment on invalidity of the '059 patent.

## B. *Presentation of Evidence*

NSC would have this court exclude all evidence concerning validity and procurement of the '059 patent from the patent liability trial. They argue that it would add to an already complicated trial. NSC suggests that even eliminating evidence of just one of the patents from the many that the jury must consider will ease the substantial burden. NSC anticipates that such evidence would be out of context, confusing to the jury and an unnecessary waste of time for the court.

In antithesis, the court believes it would be much more efficient to introduce this '059 evidence in the liability phase. The jury who will sit on the patent liability trial must necessarily be educated about the complexities of the patent applications process and law. This is not true for the jury who will attend the second antitrust/unfair competition trial. From this court's experience, the first jury will also be subjected to a great deal of technical evidence concerning manufacture, structure and operation of linear integrated circuits. This complex evidence need not be duplicated in the second trial if the latter is limited to the antitrust and unfair competition issues.

Furthermore, many of the patents are interconnected; indeed, Linear Technology asserts that the '059 patent is fundamental to many of the patents at issue. While the court does not currently possess the factual sophistication to evaluate this aspect, it does believe that excluding the '059 material from the first trial would cause vast duplication of the patent facts and law of this case. The court believes the best approach is for the first jury to be educated about how patents are properly awarded and then to determine validity of all patents. Thus, the first jury would be asked to determine if the '059 patent was invalid or inequitably procured before NSC dedicated it to the public. If invalidity is

---

**6.** The only other case of which this court is aware that concerns dedication of a patent and originates in the Ninth Circuit, *Chris–Craft Industries, Inc. v. Monsanto Co.,* 59 F.R.D. 282 (C.D.Cal.1973), does not present any counterclaims, and the court dismissed the action for want of a justiciable controversy. The court retained jurisdiction to award attorneys' fees.

found, the second jury can then address whether or not NSC's behavior constituted unfair competition, patent misuse or antitrust violations. Hopefully, this process will add minimally to the effort required of the first jury.

Should the court grant summary judgment in favor of the defendant's counterclaim regarding invalidity of the '059 patent, neither jury need confront the issue.

IT IS SO ORDERED.