# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
September 17, 2010

Lyle W. Cayce
Clerk

No. 09-50787

DUVAL WIEDMANN, LLC,

Plaintiff-Appellant,

versus

INFOROCKET.COM, INC., and INGENIO, INC.,

Defendants-Appellees.

Appeal from the United States District Court
for the Western District of Texas

Before SMITH, WIENER, and ELROD, Circuit Judges.

JERRY E. SMITH, Circuit Judge.

DuVal Wiedmann, LLC ("DuVal Wiedmann"), appeals a summary judgment on its breach-of-contract claim. We affirm the summary judgment but remand for consideration of whether DuVal Wiedmann is owed royalties for one particular period of time.

No. 09-50787

I.

The facts, though intricate, are not in material dispute. Stephen DuVal ("DuVal") is the inventor of a patent ("the '836 patent"), issued in October 1998, that includes a method to establish a voice telephone call after clicking a button on a website. DuVal filed his patent application in August 1995. While the application was pending, he filed for bankruptcy but did not list the patent application in his schedule of assets. The bankruptcy was discharged and closed in 1998.

DuVal entered into a Patent License Agreement ("License Agreement") with InfoRocket.com, Inc. ("InfoRocket"), in June 2001, granting InfoRocket an exclusive license to the '836 patent. Under the agreement, InfoRocket agreed to pay DuVal quarterly royalties based on InfoRocket's net sales of "Licensed Services."[1] In addition, it agreed to pay DuVal a minimum annual royalty if the quarterly royalties did not exceed a specified annual minimum. The License Agreement's "Termination Provision" stated: "InfoRocket will have the right to terminate the Agreement on sixty (60) days prior written notice to DuVal." The "Notice Provision" provided that "[a]ll notices to be given by each party to the other shall be made in writing by facsimile and confirmed by first-class mail addressed, respectively, to the parties . . . . Any notice shall be effective as of its date of receipt."

Pursuant to the License Agreement, DuVal agreed to reopen his bankruptcy proceeding to amend the schedule of assets to include the '836 patent. The proceeding was reopened in August 2001, and Frances Gecker was appointed as

---

[1] The License Agreement defined "Licensed Services" as "any service provided, used, offered for sale or imported using or facilitated by any system and/or method covered by the claims of the Licensed Patent where such providing, using, selling, offering to sell or importing in the absence of a right or license, would infringe the Licensed Patent."

No. 09-50787

the chapter 7 trustee. In March 2002, InfoRocket and the trustee executed an amendment ("the Amendment") to the License Agreement. The bankruptcy court granted the trustee's ratification motion, and the Amendment took effect in April 2002.

The Amendment provided that the License Agreement "shall continue in full force and effect" but that the terms of the Amendment shall control "[t]o the extent that any provision of the Amendment is inconsistent with the License Agreement." The Amendment and License Agreement were to be read together as the "Amended License Agreement." As already noted, the License Agreement's Termination Provision gave InfoRocket the right to terminate on sixty (60) days' prior written notice to DuVal. The Amended License Agreement's Notice Provision added "that copies of any notices to DuVal shall be sent to: Frances Gecker, Esquire."

Meanwhile, InfoRocket had set about asserting its exclusive license. Shortly after entering into the License Agreement, InfoRocket sued Keen, Inc. ("Keen"), for infringement of the '836 patent. In early 2003, Keen acquired InfoRocket as its wholly owned subsidiary, including InfoRocket's rights under the Amended License Agreement. InfoRocket dismissed its action against Keen, and Keen and the trustee entered into a "Release Agreement." Later in 2003, Keen changed its name to Ingenio, Inc. ("Ingenio").

Ingenio filed a "Request for Reexamination" of the '836 patent with the Patent and Trademark Office ("PTO") on April 23, 2004. The PTO canceled 41 of the 56 original '836 patent claims and rejected the remaining 15 claims as "unpatentable" in light of prior art. DuVal amended the original claims, and, in December 2008, the PTO issued a "Reexamination Certificate" that included only the amended claims.

On August 24, 2004, DuVal sent a letter to Ingenio's CEO stating that the

3

No. 09-50787

bankruptcy case was closed and asking that all future notices, as well as an upcoming royalty payment, be sent directly to DuVal. An Ingenio executive forwarded the letter to Ingenio's counsel at Fenwick & West on August 30. That same day, a different Ingenio executive replied to DuVal that Ingenio would send the royalty payment to the trustee because it had not received official notice that the bankruptcy proceeding had ended. The bankruptcy case did not end, in fact, until September 23, 2004.

On August 31, 2004, Ingenio's Executive Vice President, Paul Manca, sent a letter ("the Manca Letter") to the trustee giving notice of Ingenio's termination of the Amended License Agreement. On September 27, the trustee informed DuVal of the termination notice and sent him a copy of Ingenio's letter, which DuVal received on September 30. DuVal states that he did not realize then that Ingenio's notice was "fatally defective" because it had been sent to the trustee instead of him. DuVal did not come to that realization, in fact, until December 24, 2008, when he filed an amended complaint in this case, repudiating the termination.

In the interim, DuVal gave every indication that he understood Ingenio's termination to have been effective. In March 2005, for instance, he sent a letter to Ingenio's CEO that stated, in relevant part: "On August 31, 2004 Ingenio sent Ms. Gecker, the bankruptcy Trustee, notice of cancellation on InfoRocket's license. Section 8.1 of the license provides that the license can be terminated on 60 days prior written notice. Thus the license terminated on October 31, 2004."

Ingenio seized on DuVal's statement that "the license terminated on October 31, 2004." It sent DuVal a letter in April 2005, affirming DuVal's statement that the Amended License Agreement had been terminated. DuVal did not respond.

In July 2005, in response to another letter from DuVal, Ingenio again ac-

4

No. 09-50787

knowledged that it had terminated the Amended License Agreement effective October 31, 2004. In anticipation of this suit, DuVal formed DuVal Wiedmann, LLC ("DuVal Wiedmann"), and assigned all his rights under the Amended License Agreement to that entity.

II.

In January 2008, DuVal Wiedmann sued InfoRocket and Ingenio, alleging breach of the Amended License Agreement and failure to pay $326,707 in minimum annual royalties for 2004. The complaint stated that "INGENIO exercised its termination right by sending DuVal notice of termination on August 31, 2004. Accordingly, the contract was terminated 60 days later, on October 31, 2004."

DuVal Wiedmann repudiated that admission, however, in its amended complaint, stating that the Amended License Agreement "has not been terminated and minimum royalties continue to accrue." Under the amended complaint, DuVal Wiedmann seeks (1) declaratory judgment that InfoRocket and Ingenio "did not terminate the Amended License by sending the August 31, 2004 letter to the Trustee," (2) "unpaid, due and owing minimum royalties for the years 2004-2007 under the terms of the Amended License Agreement," and (3) "unpaid royalties that are to become due and owing for the years 2008 and 2009."

At his deposition, DuVal testified that as of September 30, 2004, he believed that Ingenio had successfully terminated the Amended License Agreement and that he never represented otherwise to the defendants until DuVal Wiedmann filed the amended complaint. Specifically, DuVal stated that Ingenio "had no reason to think I didn't consider the license terminated."

InfoRocket and Ingenio moved for summary judgment. The district court referred the motion to a magistrate judge ("MJ") for a report and recommendation. The MJ, applying New York law, recommended that summary judgment

5

No. 09-50787

be granted, reasoning that DuVal received "actual notice" of termination on September 30, 2004, when he received Ingenio's termination letter by way of the trustee and that he was not prejudiced by the lack of strict compliance with the Termination Provision. The MJ interpreted the language of the Termination Provision to create a conditional limitation rather than a condition subsequent. Accordingly, the MJ interpreted the agreement to have terminated automatically on November 29, 2004, sixty days after when DuVal received actual notice of termination.

Turning to the question of royalties, the MJ recommended that, based on the doctrine of *Lear, Inc. v. Adkins*, 395 U.S. 653, 671-73 (1969), defendants were "released from any obligation to pay royalties due under the Amended License Agreement for the period between April 23, 2004 and November 29, 2004," because they had filed a successful "Request for Reexamination" of the '836 patent.

The district court adopted the MJ's recommendation and granted summary judgment. The court held that the Amended License Agreement had terminated on November 29, 2004, and that under the *Lear* doctrine, defendants did not accrue any royalty obligations after April 23, 2004.

III.

We review a summary judgment *de novo*, applying the same standard as did the district court and viewing the evidence in the light most favorable to the non-moving party. *Bolton v. City of Dallas*, 472 F.3d 261, 263 (5th Cir. 2006). "Summary judgment is appropriate where the record demonstrates that there is no issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.* (internal citation omitted).

DuVal Wiedmann raises three issues on appeal. It first argues, contrary to numerous previous admissions, that the Amended License Agreement was

6

No. 09-50787

never terminated and that defendants continue to incur royalty obligations. It further avers that the *Lear* doctrine does not apply. Finally, it asserts that the district court failed to consider whether royalties are owed from January 1 to April 23, 2004.

A.

The Amended License Agreement expressly provides that New York law governs the interpretation of the agreement. Texas law favors the enforcement of contractual choice-of-law provisions. *See Int'l Interests, L.P. v. Hardy*, 448 F.3d 303, 306-07 (5th Cir. 2006). Accordingly, we look to New York law to see whether defendants provided sufficient notice of termination. The district court relied on *Suarez v. Ingalls*, 723 N.Y.S.2d 380, 381 (App. Div. 2001), for the rule that "[s]trict compliance with the contract notice provisions was not required because the plaintiff does not claim that [it] did not receive actual notice, or was prejudiced by the deviation." *See also Dellicarri v. Hirschfeld*, 619 N.Y.S.2d 816, 817 (App. Div. 1994).

DuVal Wiedmann first argues that the language of the Termination Provision created an express condition precedent that was never performed, so the district court erred in its reliance on *Suarez* and *Dellicarri*, because that line of cases does not apply to conditions precedent. DuVal Wiedmann urges instead that we look to *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 660 N.E.2d 415 (N.Y. 1995), and *Bausch & Lomb, Inc. v. Bressler*, 977 F.2d 720 (2d Cir. 1992).

"A condition precedent is an act or event, other than a lapse of time, which, unless the condition is executed, must occur before a duty to perform a promise in the agreement arises." *Oppenheimer*, 660 N.E.2d at 418 (internal citations and quotations omitted). "Express conditions must be literally performed,

7

No. 09-50787

whereas constructive conditions, which ordinarily arise from language of promise, are subject to the precept that substantial compliance is sufficient." *Id.* Critically, New York courts will not read ambiguous language as creating a condition precedent.[2]

As we have said, the Termination Provision states that "InfoRocket will have the right to terminate the Agreement on sixty (60) days prior written notice to DuVal." DuVal Wiedmann argues that that language strictly required that notice be sent to DuVal as a condition precedent to termination. We cannot agree. Unlike the agreement in *Oppenheimer*, which "employed the unmistakable language of condition ('if,' 'unless and until')," *id.*, the Termination Provision contains no conditional language, and literal performance was therefore not required.

DuVal Wiedmann refers us to the preamble to Section 8, which provides that, "[u]nless sooner terminated or extended as herein provided, this Agreement shall continue in full force and effect . . . continuing until the expiration of the Licensed Patent." DuVal Wiedmann contends that the preamble, in combination with Section 8.1, unambiguously established direct notice to DuVal as an express condition precedent to termination.

DuVal's own actions belie that point. DuVal understood the agreement to have been terminated for over four years. The original complaint, filed by his present attorney, stated that "INGENIO exercised its termination right by sending DuVal notice of termination on August 31, 2004." Admittedly, the provision contains some ambiguity, but "[i]f the language is in any way ambiguous, the law does not favor a construction which creates a condition precedent." *Ashkena-*

---

[2] *Ashkenazi v. Kent S. Assocs., LLC*, 857 N.Y.S.2d 693, 694 (App. Div. 2008) ("A contractual duty will not be construed as a condition precedent absent clear language showing that the parties intended to make it a condition.") (citation omitted).

8

No. 09-50787

*zi*, 857 N.Y.S.2d at 694 (citation omitted).

Even when read in combination with the preamble to Section 8, the Termination Provision does not contain plain language requiring literal performance, and, under New York law, we must "interpret doubtful language as embodying a promise or constructive condition rather than an express condition." *Oppenheimer*, 660 N.E.2d at 418. We agree with the district court that "[s]trict compliance with the contract's notice provisions was not required," because Du-Val received actual notice and was not "in any way prejudiced as a result of this minimal deviation." *Dellicarri*, 619 N.Y.S.2d at 817.[3]

DuVal Wiedmann next argues that the Termination Provision also created a condition subsequent, rather than a conditional limitation. It asserts that Section 8.1 only gave Ingenio the *option* to terminate the agreement at the end of the sixty-day period, an option it claims Ingenio never exercised. DuVal Wiedmann, however, places too much weight on Section 8.1's slender shoulders.

"[W]here a party has the option either to terminate the contract upon the occurrence of an event or not to terminate . . . then the contract contains a condition subsequent." *In re St. Casimir Dev. Corp.*, 358 B.R. 24, 39 (S.D.N.Y. 2007). In other words, a condition subsequent exists where "something more than the passage of time" after a triggering event is required to effect termination. *Id.* at 40. In *St. Casimir*, the partnership agreement gave the right, "*but not the obligation*," to remove a partner on ten days' notice. *Id.* at 37. Here, by contrast, the Termination Provision did not state that InfoRocket could choose not to terminate the agreement sixty days after providing written notice of ter-

---

[3] *Bressler* does not compel a different result. That case involved a termination on two days' notice in contravention of the agreement's 30-day notice period. *Bressler*, 977 F.2d at 727. The *Bressler* court held that the 30-day period was a condition precedent to termination. Because here neither party argues that the agreement terminated earlier than 60 days after DuVal received notice, *Bressler* is inapposite.

9

No. 09-50787

mination. Nor did Ingenio's notice evince its *intent* to terminate; rather, it stated, "Ingenio hereby provides you with notice of its termination of the License Agreement."

The district court correctly held that the agreement automatically terminated at the end of the notice period. "First of all, this is just plain common sense." *VNO 100 W. 33rd St. LLC v. Square One, Inc.,* 874 N.Y.S.2d 683, 687 (Civ. Ct. 2008). "Clearly, if the right [to terminate] exists and the notice is sent, the [agreement] terminates." *Id.* "[I]f a 'Notice of Termination' only provided a 'right to terminate,' one would expect that a detailed [agreement] would set forth how [defendant] could then exercise this supposed [right]. Not surprisingly, the mechanics of this secondary notice are not spelled out." *Id.*

As was true for the agreement in *VNO*, the Amended License Agreement provides no additional procedures to indicate that termination required "something more than the passage of time." *St. Casimir*, 358 B.R. at 40. Quite to the contrary, the Amended License Agreement's Notice Provision explicitly provides that "[a]ny notice shall be effective as of its date of receipt." The district court therefore correctly held that the Amended License Agreement terminated on November 29, 2004, sixty days after DuVal received actual notice.

B.

In *Lear*, 395 U.S. at 670-71, the Court overruled *Automatic Radio Manufacturing Co. v. Hazeltine Research, Inc.,* 339 U.S. 827 (1950), which had held that patent licensees were estopped from challenging the validity of their licensor's patent. *Lear* rejected the estoppel rule and held that a licensee may challenge the validity of the patent licensed to it. *Id.* It further held that, if the challenge is successful, the licensee is not obligated to pay royalties that accrue, in-

10

No. 09-50787

cluding those that accrue from the date of the challenge. *Id.* at 671-73.[4]

DuVal Wiedmann argues that the Amended License Agreement was a settlement agreement and that, under the rule of *Hemstreet v. Spiegel, Inc.*, 851 F.2d 348 (Fed. Cir. 1988), *Lear* therefore does not apply. It further maintains that the '836 patent was not invalidated because the PTO issued a reexamination certificate. In other words, DuVal Wiedmann contends that a materially flawed patent or one that is substantively amended does not trigger *Lear*. Both arguments are incorrect.

It is true that *Hemstreet*, 851 F.2d at 350-51, carved out an exception to *Lear* in the context of settlement agreements, but nothing indicates that the Amended License Agreement was a settlement agreement. *Hemstreet* involved an explicit "settlement agreement" memorialized in a "Settlement Order." *Id.* at 349-50. DuVal Wiedmann would have us interpret the bankruptcy court's ratification of the Amended License Agreement as evidence of a settlement. But it cannot show any discussion of a "settlement" or of the issuance of a settlement order, or anything that was "settled" by way of the Amended License Agreement.[5]

Relying on the PTO's ultimate issuance of a reexamination certificate, DuVal Wiedmann next argues that defendants' challenge to the '836 patent was ultimately unsuccessful and that *Lear* does not apply. That certificate, however, included only amended claims.

_____

[4] *See also MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 124 (2007) ("[I]n *Lear* . . . we rejected the argument that a repudiating licensee must comply with its contract and pay royalties until its claim is vindicated in court.").

[5] DuVal Wiedmann refers us to paragraphs 11, 12, 13, and 17 of the trustee's Motion to Ratify and Amend Patent License Agreement. R. 375-77. Those paragraphs do not refer to any settlement, or even any dispute, about the validity of the '836 patent. Rather, those passages merely discuss two adversary proceedings that would be rendered moot by the Amended License Agreement.

If claims amended during reexamination are not "identical" to the claims in the original patent, "the patentee has no right to recover infringement damages for periods prior to the date that the reexamination certificate issued." *Tennant Co. v. Hako Minuteman, Inc.*, 878 F.2d 1413, 1417 (Fed. Cir. 1989). The License Agreement requires defendants to pay royalties for "Licensed Services," which it defines as services whose provision, use, sale, or offer "in the absence of a right or license, would infringe the Licensed Patent." *See supra* n.1. Thus, unless the amended claims are identical to those in the original patent, their use could not infringe the Licensed Patent and therefore could not constitute Licensed Services.

In this context, "identical" means "without substantive change." *Id.* In *Fortel Corp. v. Phone-Mate, Inc.*, 825 F.2d 1577 (Fed. Cir. 1987), the court faced the sole issue of "whether the district court erred in determining that the amended claims in the reexamination certificate were not substantively identical with the original claims, thus precluding enforcement of the amended claims for the period before the certificate issued." *Id.* at 1580. The court found it "an inescapable conclusion" that the amended claims were not substantively identical "upon a mere reading of those claims." *Id.* at 1580-81.

DuVal Wiedmann does not dispute that it substantively amended the few remaining claims for which the PTO issued a reexamination certificate. Nor does it challenge that those claims required amendment to overcome prior art. It is "difficult to conceive" that a claim amended to avoid prior art could be substantively identical to the original claim. *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1348 (Fed. Cir. 1998).

The district court correctly applied the *Lear* doctrine. Independently of whether the agreement terminated on November 29, 2004, defendants did not accrue any royalty obligations for the '836 patent during any time after April 23,

No. 09-50787

2004, the date on which they filed their reexamination request.

## C.

The district court did not address what royalties, if any, are owed to DuVal Wiedmann from January 1 to April 23, 2004. DuVal Wiedmann argues that it is owed the entire minimum annual royalty for 2004, $393,374 plus prejudgment interest. At oral argument, DuVal Wiedmann's counsel stated its position that the entire minimum annual royalty would be owed even if the agreement terminated only a few hours into January 1, 2004. Defendants unsurprisingly take the opposite stance, reasoning that because the obligation to pay running royalties ceased on April 23, 2004, under the *Lear* doctrine the obligation to pay minimum annual royalties on a "deficiency basis" also ceased. Defendants urge, in the alternative, that, at best, DuVal Wiedmann may be owed prorated pre-challenge royalties. We decline to address this issue for the first time on appeal and instead remand it for the district court to decide.

For the reasons stated, the summary judgment is AFFIRMED. We REMAND to the district court to determine what amount, if any, DuVal Wiedmann is owed in royalties for January 1 to April 23, 2004, including any prejudgment interest. We express no view on how that question should ultimately be resolved.