# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-10352

United States Court of Appeals
Fifth Circuit

**FILED**

December 13, 2013

Lyle W. Cayce
Clerk

APL LOGISTICS AMERICAS, LIMITED,

Plaintiff-Appellee

v.

TTE TECHNOLOGY, INCORPORATED,

Defendant-Appellant

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:10-CV-2234

Before KING, BENAVIDES, and DENNIS, Circuit Judges.

PER CURIAM:*

In this breach of contract case, Plaintiff-Appellee APL Logistics Americas, Ltd. asserts that Defendant-Appellant TTE Technology, Inc. failed to comply with the terms of a warehouse services agreement by not paying a monthly facility charge after invoking the agreement's early termination clause. On cross-motions for summary judgment, the district court found in APL Logistics Americas, Ltd.'s favor, except as to attorney's fees. For the

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-10352

following reasons, we REVERSE the district court's partial grant of summary judgment and RENDER judgment in favor of TTE Technology, Inc.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2007, Plaintiff-Appellee APL Logistics Americas, Ltd. ("APL") and Defendant-Appellant TTE Technology, Inc. ("TTE") entered into the Dallas Warehousing Agreement ("Dallas Agreement"). Under the terms of the Dallas Agreement, APL agreed to provide warehouse space and related services to TTE, and TTE agreed to pay APL according to the rates and charges set forth in Schedule B of the agreement. Schedule B included a "Monthly Facility Charge," consisting of rent, and fees for management and supervision, warehouse equipment, systems depreciation, security, insurance, systems communication, and miscellaneous operating expenses.

Although the Dallas Agreement was intended to last from August 1, 2007, to July 31, 2010, the agreement also contained an "Early Termination" clause. Section 9.1 of the Dallas Agreement provided that if TTE terminated the agreement early it would pay various costs and expenses related to the warehouse services APL provided. In particular, Section 9.1A provided that TTE would continue to pay the Monthly Facility Charge for the original duration of the agreement.

From 2007 to 2010, APL provided TTE warehouse services at two buildings in the greater Dallas area.[1] The first building was at 410 West Trinity Boulevard, Suite 100, Grand Prairie, TX 75050 ("Building 410"). The second building was at 510 West Trinity Boulevard, Suite 300, Grand Prairie,

---

[1] Although APL provided warehouse services at two buildings, the Dallas Agreement itself did not differentiate between the warehouses in which TTE's products were stored. Schedule A of the Dallas Agreement instead simply referred to "Location(s): Dallas, Texas," and the rest of the agreement referred to the singular "[w]arehouse."

No. 13-10352

TX 75050 ("Building 510"). APL did not own either property, but leased both buildings under a written lease agreement with a third party.

In 2009, the parties discussed how to reduce costs and TTE's warehouse needs. APL and TTE entered into Amendment No. 2 to the Dallas Agreement ("Amendment No. 2"), pursuant to which TTE would continue to occupy 190,000 square feet of warehouse space as originally contemplated in the Dallas Agreement until July 31, 2010, after which APL would reduce TTE's warehouse space to 75,000 square feet. In exchange, TTE agreed to extend the Dallas Agreement from July 31, 2010, to July 31, 2012.

Shortly after APL and TTE agreed to the terms of Amendment No. 2, TTE contacted APL about more rapidly reducing the warehouse space. On September 16, 2009, APL sent TTE a "Memorandum of Understanding" ("MOU") in which APL proposed to move TTE's products from Building 410 to Building 510, terminate APL's lease of Building 410 early, and extend APL's lease of Building 510 from March 31, 2010, to March 31, 2013. To effectuate this move, TTE agreed to pay APL a one-time termination fee for Building 410 in the amount of $136,000. TTE also agreed to waive a credit of $14,286 for the months of January through July 2010. APL in turn guaranteed TTE savings in the amount of $236,000. Additionally, Paragraph 2 of the MOU provided that

> [u]pon payment of the Lease Termination Fee, TTE will no longer have any obligations under Section 9.1A of the [Dallas] Agreement. However, TTE will continue to pay the Monthly Facility Charge set forth in Schedule B through December 31, 2009 for Building 410.

The parties executed the MOU in October 2009. Less than a year later, in April 2010, TTE asked APL for a summary of the amounts TTE would owe if TTE terminated the Dallas Agreement early. APL sent TTE a summary, which included Section 9.1A's Monthly Facility Charge. TTE responded that

3

it was not responsible for costs listed under Section 9.1A. TTE then sent APL a letter terminating the Dallas Agreement.

APL filed suit in Texas state court on September 24, 2010, alleging one count of breach of contract and one count of fraudulent inducement. TTE removed the case to the United States District Court for the Northern District of Texas on November 4, 2010. APL filed an amended complaint against TTE alleging a single count of breach of contract. TTE and APL then filed cross-motions for summary judgment in May 2012.

Agreeing with APL that "Paragraph 2 [of the MOU] only extinguishe[d] TTE's obligation to pay the Monthly Facility Charge for Building 410, not Building 510," the district court granted in part and denied in part APL's motion for summary judgment, and denied TTE's motion. As to damages, the district court reasoned that the Dallas Agreement did "not include language to suggest that the stated remedy [in Section 9.1] was intended to be exclusive." It therefore found that APL was entitled to recover so-called "lost handling charges"—the estimated amount APL would have received for moving TTE's products into and out of storage. The district court denied APL's request for attorney's fees.

Following the district court's order, TTE moved to clarify or, in the alternative, alter or amend judgment. On March 5, 2013, the district court entered an order clarifying that TTE's motion for summary judgment was granted as to APL's request for attorney's fees and denied in all other respects. On the same day, the district court entered final judgment in APL's favor in the amount of $1,661,962, representing $1,279,909 for the Monthly Facility Charge and $382,053 for APL's lost handling charges.

TTE timely filed a notice of appeal on March 28, 2013.

No. 13-10352

## II. STANDARD OF REVIEW

"We review a grant of summary judgment *de novo*, viewing all evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor." *Pierce v. Dep't of the U.S. Air Force*, 512 F.3d 184, 186 (5th Cir. 2007). "[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). When parties file cross-motions for summary judgment, "we review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001).

## III. DISCUSSION

On appeal, TTE challenges the district court's ruling that TTE breached the terms of the Dallas Agreement and that TTE is liable for APL's lost handling charges. We conclude that the MOU discharged TTE's obligation to pay the Monthly Facility Charge as to both Building 410 and Building 510, and that, as a result, TTE did not breach the terms of the Dallas Agreement. Accordingly, we do not reach the separate question of whether TTE also would be liable for APL's lost handling charges.

It is undisputed that the MOU, pursuant to its choice of law provision, is governed by New York law. *See DuVal Wiedmann, LLC v. InfoRocket.com, Inc.*, 620 F.3d 496, 501 (5th Cir. 2010); *Resolution Trust Corp. v. Northpark Joint Venture*, 958 F.2d 1313, 1318 (5th Cir. 1992) ("Under the Texas rules, in those contract cases in which the parties have agreed to an enforceable choice of law clause, the law of the chosen state must be applied."). Under New York law, "an unambiguous contract is construed as a matter of law." *Highland*

No. 13-10352

*Capital Mgmt., L.P. v. Bank of Am., Nat'l Ass'n*, 698 F.3d 202, 209 (5th Cir. 2012). "A written agreement is ambiguous only if it is *reasonably* susceptible of more than one interpretation." *RM Realty Holdings Corp. v. Moore*, 884 N.Y.S.2d 344, 346 (N.Y. App. Div. 2009) (emphasis in original). "Parol evidence—evidence outside the four corners of the document—is admissible only if a court finds an ambiguity in the contract." *Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 433 (N.Y. 2013).

The parties' dispute centers on the meaning of Paragraph 2 of the MOU. Paragraph 2 reads:

> Upon payment of the Lease Termination Fee, TTE will no longer have any obligations under Section 9.1A of the Agreement. However, TTE will continue to pay the Monthly Facility Charge set forth in Schedule B through December 31, 2009 for Building 410.

The first sentence of Paragraph 2 refers to Section 9.1A of the Dallas Agreement, which reads, in relevant part, that TTE agreed upon early termination "[t]o assume . . . [APL]'s lease . . . for the Warehouse and all of [APL]'s obligations thereunder . . . [or] to continue to pay to [APL] through the end of the stated term of this Agreement . . . [APL]'s actual costs and expenses associated with the Warehouse including without limitation the *Monthly Facility Charge*."[2] (emphasis added).

TTE urges that the first sentence of Paragraph 2 unambiguously provides that once TTE pays a "one-time termination fee for Building 410," TTE "will no longer have *any* obligations under Section 9.1A," including the Monthly Facility Charge. We agree. The provision does not disclose any limitation on what parts of Section 9.1A will no longer apply. The provision also does not distinguish between the warehouses for which TTE will no longer

---

[2] As already noted, the Dallas Agreement did not differentiate between Building 410 and Building 510.

6

have to pay the Monthly Facility Charge. Indeed, it is difficult to see how the first sentence could more clearly state that TTE was relieved of *any* obligation under Section 9.1A upon payment of the one-time termination fee.

Our understanding is not altered by Paragraph 2's second sentence, which expressly states that TTE will pay the Monthly Facility Charge *as to Building 410* through December 31, 2009. If anything, the fact that the second sentence specifically identifies one warehouse reinforces our determination that the first sentence's failure to do so as to the word "any" means that TTE's obligations under Section 9.1A were discharged generally, and not as to one particular building.

APL's arguments resisting this interpretation are unpersuasive.[3] APL first argues that read in its entirety, the MOU demonstrates that the parties intended to limit the first sentence of Paragraph 2 to Building 410. But we find no language anywhere in the MOU, or the Dallas Agreement, that evidences such an intent. *See Slamow v. Del Col*, 594 N.E.2d 918, 919 (N.Y. 1992) ("The best evidence of what parties to a written agreement intend is what they say in their writing."). Nor does APL direct us to such language. APL instead, during oral argument, contended that the MOU was structured such that Paragraph 1 referred to both Building 410 and 510, Paragraph 2 referred only to Building 410, and Paragraph 3 referred only to Building 510. While

---

[3] In its brief, APL additionally argued that the MOU was not intended to change the terms of the Dallas Agreement and that the MOU expired after TTE's products were moved into Building 510. A brief review of the MOU shows, however, that it clearly was intended to alter the Dallas Agreement. For example, the MOU expressly refers to TTE foregoing a credit to which TTE was otherwise entitled under Amendment No. 2 of the Dallas Agreement. Moreover, although Paragraph 5 of the MOU provides that the MOU would "expire upon the completion of the transfer of TTE's products to Building 510," the MOU's terms were obviously intended to last beyond the move. This is evident from the fact that while the parties agreed that TTE's products would be moved to Building 510 by January 1, 2010, the MOU also bound APL to ensuring that TTE realized savings of at least $236,000 between January 1, 2010, and July 31, 2010.

such a division may be analytically satisfying, it is unsupported by any other language in the MOU, such as, for example, a paragraph heading identifying a particular provision as only relating to one warehouse. *See N.Y.C. Off-Track Betting Corp. v. Safe Factory Outlet, Inc.*, 809 N.Y.S.2d 70, 73 (N.Y. App. Div. 2006) (mere assertion "that contract language means something other than what is clear when read in conjunction with the whole contract is not enough to create an ambiguity").

APL alternatively appears to argue that Paragraph 2's use of the word "any" is ambiguous and that we thus should consider the circumstances under which the MOU was drafted, as well as other parol evidence. Ignoring that APL steadfastly maintained in its brief and during oral argument that the MOU is *unambiguous*, APL also fails to point to any other language in the MOU that would render the term "any" unclear. Even following APL's suggestion that we replace the term "Lease Termination Fee" in Paragraph 2 with the definition provided in Paragraph 1 produces no ambiguity:

> Upon payment of the [one-time termination fee for Building 410 in the amount of $136,000], TTE will no longer have any obligations under Section 9.1A of the Agreement.

As with the second sentence of Paragraph 2, the inclusion of contract clauses that distinguish between Building 410 and Building 510 supports our conclusion that when the MOU fails to differentiate between the two warehouses, it should not be understood to specifically refer to one or the other. Thus, when the MOU says Building 410, we understand it to refer to Building 410, and when the MOU says "any," we take it to mean "any." We refuse to re-write the MOU to limit the application of the word "any" in Paragraph 2 to Building 410 only.[4]

---

[4] Agreeing with TTE and APL that the contract is unambiguous, we do not consider the parol evidence both parties present in support of their respective interpretations. *See*

No. 13-10352

APL's second argument is that interpreting the MOU to relieve TTE of its obligations under Section 9.1A as to *both* Building 410 and Building 510 would be unreasonable and absurd because it would leave APL without any remedy in the event TTE terminated the Dallas Agreement early. "A contract should not be interpreted to produce a result that is absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties." *In re Lipper Holdings, LLC*, 766 N.Y.S.2d 561, 562 (N.Y. App. Div. 2003) (internal citations omitted). But APL's contention that adopting TTE's interpretation leaves APL without a remedy is incorrect. Paragraph 2 discharged TTE's duties only as to Section 9.1A of the Dallas Agreement, i.e., the Monthly Facility Charge. This left intact Section 9.1B–F, which included five other conditions TTE had to satisfy before availing itself of the Dallas Agreement's early termination clause. These included purchasing equipment that APL had bought or assuming APL's lease as to any such equipment, and paying "severance" and "final inventory" costs. TTE actually was prepared to pay APL over $50,000, although APL appears to have refused payment. TTE also paid the aforementioned $136,000 lease termination fee, and waived a credit totaling $100,000.

In sum, APL fails to identify language in the MOU explaining why the words "any obligations under Section 9.1A of the Agreement" should be read to mean "only as to Building 410." That this may not have been the parties' original intent in drafting the MOU is irrelevant—absent contractual ambiguity, we do not look beyond the four corners of the agreement. Here, the MOU states that TTE is relieved of paying "any" of the costs listed under

*ABS P'ship v. AirTran Airways, Inc.*, 765 N.Y.S.2d 616, 620 (N.Y. App. Div. 2003) ("When the terms of a contract are clear dand unambiguous, the intent of the parties must be found within the four corners of the document, and the court must enforce it without recourse to parol evidence.").

No. 13-10352

Section 9.1A of the Dallas Agreement, and we enforce that term as written. Because we find that TTE did not breach the Dallas Agreement, we do not reach TTE's alternative argument that APL is not entitled to lost handling charges.

## IV. CONCLUSION

For the aforementioned reasons, we REVERSE the district court's grant of partial summary judgment for APL and RENDER judgment in TTE's favor.